IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DARRYL CALHOUN,            )
                           )
        Plaintiff,          )
                           )
   v.                       )    No. 12 C 6447
                           )
CAROLYN W. COLVIN,         )
Acting Commissioner of Social )
Security.[1]                )
                           )
        Defendant.          )

## MEMORANDUM OPINION AND ORDER

Darryl Calhoun ("Calhoun") seeks judicial review, pursuant to Social Security Act ("Act") §§ 405(g) and 1383(c)(3),[1] of the final decision of Acting Commissioner of Social Security Carolyn Colvin ("Commissioner")[2] denying Calhoun's claim for supplemental security income ("SSI") disability benefits. Calhoun has moved alternatively for summary judgment under Rule 56 or to remand for further proceedings, while Commissioner's cross-motion for summary judgment seeks affirmance of the decision. For the reasons stated in this memorandum opinion and order, both motions

---

[1] Carolyn Colvin is now the Acting Commissioner, having replaced Commissioner Michael Astrue. Fed.R.Civ.P. ("Rule") 25(d) provides for her automatic substitution as a party, and both the case caption and the text treat her as such (including attributing the final decision at the administrative level to her, even though it antedated her taking office).

[2] All further statutory references will take the form "Section --," using (as in the text above) the Title 42 numbering rather than the Act's internal numbering. All portions of 20 C.F.R. will be cited "Reg. § --."

for summary judgment are denied and Calhoun's motion for remand is granted.

**Procedural Background[3]**

Calhoun filed an SSI application on December 12, 2007, alleging a disability onset date of February 15, 2007 (R. 22). Calhoun's application was denied on initial review and was again denied following a September 21, 2009 hearing (the "Hearing") before Administrative Law Judge ("ALJ") Jose Anglada (R. 36). Calhoun requested review of the decision by the Appeals Council on January 28, 2011, but that too was denied (R. 1). Thus ALJ Anglada's decision is the final decision of Commissioner. This action was timely filed on August 14, 2012.

**Medical Evidence**

Calhoun was born on February 25, 1964. In February 2007 he developed an "extremely pruiritic" lesion on his neck that interfered with his sleep (R. 412). Because the wound had not healed by July 2007, Calhoun returned to the Veterans' Administration ("VA") hospital complaining of itching and burning at the wound site (R. 433). In August 2007 Calhoun was admitted to the VA hospital with suicidal ideation (R. 467) -- he "felt hopeless and helpless" as his pain had not abated, and he considered jumping out a window (R. 467). VA doctors noted that

---

[3] What follows in the next sections of the text is drawn from the administrative record (cited "R. --").

2

his mood was anxious and labile and his judgment and insight were poor (R. 467). In October 2007 Calhoun again presented at the VA hospital complaining of neck pain, and doctors observed that the wound was raw and bleeding (R. 538). Calhoun also continued to complain of depression (R. 538).

In January 2008 doctors performed a skin graft on the neck wound (R. 473). In March 2008 Calhoun presented himself for treatment with a worried mood and constricted affect (R. 724). He had picked through the skin graft, which he claimed relieved feelings of anxiety (R. 724). Doctors noted compulsive picking behavior and diagnosed depression secondary to a chronic skin condition (R. 724).

In May 2008 Calhoun was admitted to a program for homeless veterans. Upon admission he stated that he had been taking antidepressants but that they were ineffective and that "nothing [was] really worthwhile anymore" (R. 783). He complained that his neck wound was causing shoulder pain and interrupting his sleep and that racing thoughts would sometimes keep him awake for two to three days (R. 787, 794).

In June 2008 Calhoun presented at the emergency room of the VA hospital, complaining of severe pain from his neck wound that was not relieved by medication (R. 741, 761). Calhoun was unable to stop picking at the wound and complained of feeling that bugs were crawling on his skin (R. 745, 761). Doctors also observed

3

that he seemed depressed and ordered a psychological evaluation (R. 741). In October 2008 doctors ordered a Transcutaneous Electrical Nerve Stimulation ("TENS") device to provide pain and itch relief for Calhoun's neck wound (R. 892), but he continued to complain of pain, itchiness and sleeplessness (R. 899).

In January and February 2009 Calhoun was again admitted to the hospital complaining of severe pain at the wound site (R. 975). In February 2009 he was transferred to the VA hospital from another hospital after expressing suicidal ideation (R. 975). He stated that he was depressed because the wound had not healed, and doctors noted an impairment of his insight and judgment along with issues with fatigue (R. 874, 975). Doctors also noted that he had a history of picking at his wound and had picked out the hairs from his beard to the point that the area bled (R. 976). When a tissue sample of the wound was taken, it tested positive for Methicillin-Resistant Staphylococcus Aureus ("MRSA").

In June 2009 Calhoun began inpatient treatment at the Extended Care Center of the Hines VA hospital (R. 69, 928). Calhoun described his pain level as 12 on a 10 point scale. Doctors prescribed pain medication and physical therapy to strengthen the neck muscles (R. 909, 935).

In addition to the physical and psychological issues stemming from his neck wound, Calhoun has also been treated for

4

substance abuse and other psychological issues. In April 2008 Calhoun entered a substance abuse program at the VA hospital (R. 721). Doctors in that program diagnosed major depression and prescribed antidepressants, but his suicidal ideation continued (R. 721, 859). Calhoun began individual counseling sessions to treat post-traumatic stress disorder ("PTSD") that stemmed from a sexual assault, and he also attended group therapy sessions for substance abuse in 2009 (R. 772, 920, 939). Despite those various treatments and therapies, Calhoun continued to complain of depression, suicidal thoughts, anxiety, mood fluctuations, manic periods, trouble concentrating and nightmares (R. 947-48, 961, 1023).

**Calhoun's Hearing Testimony and Adult Function Report**

Calhoun testified about his disabilities at the Hearing. He testified that the wound had still not healed after 2-1/2 years of treatment, that he suffered from diabetes mellitus that interfered with the proper healing of the wound, that the wound was painful and itchy and required doctors to change the dressing frequently, that doctors had advised him not to dress the wound himself because it aggravated the wound, that attempts at reducing the pain were fruitless, that the pain from the wound impaired his thinking and focus and that the wound prevented him from moving his head and carrying heavy objects (R. 52-54, 64, 66, 69-71, 74).

Calhoun also testified about his psychological issues, stating that his mood had not improved despite the depression treatments, that his mood could vacillate from minute to minute and that when he felt depressed he wanted to be left alone (R. 78). Calhoun also testified about his difficulties in sleeping, stating that he suffered from sleep apnea and insomnia and that his lack of sleep caused him to be very tired during the day and to fall asleep sometimes in mid-conversation (R. 56-59, 79).

Calhoun also submitted an Adult Function Report where he opined on his disabilities (R. 283-90), stating that he had restrictions in lifting, squatting, bending, reaching, sitting, walking, kneeling, seeing, stair climbing, remembering, concentration, completing tasks, following directions and getting along with others (R. 288). Additionally he stated that he was unable to operate a motor vehicle, unable to fall asleep or stay asleep and had difficulties getting along with others (R. 284, 286). Moreover, he added that his attention span was adversely affected by his lack of sleep, that his ability to follow instructions varied based on his mood and that he could not handle stress or changes in routine and had trouble dealing with authority figures (R. 286, 289).

### Vocational Expert's Testimony

Vocational Expert ("VE") Lee Knutson testified at the Hearing about the availability of jobs to a hypothetical

individual having Calhoun's age, education and experience. ALJ Anglada first asked VE Knutson about such an individual who had certain "moderate" limitations, such as an inability to maintain attention and concentration and an inability to complete a normal workday (R. 83). VE Knutson responded that such "moderate" limitations "could be problem areas," but that "work is not precluded" (R. 83). He went on to say that given the limitations it "would be safer, to just say he could do the unskilled work, like, as a bus servicer" (R. 84). When questioned by Calhoun's attorney, VE Knutson testified that if a person were unable to stay on task for 85% to 90% of the time, he would lose his job and that the bus servicer job required more than a two-step operation and required someone to have "occasional" flexibility in his or her neck (R. 86-88).

**Standard of Review and Applicable Law**

In reviewing Commissioner's decision, this Court considers its legal conclusions de novo (Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005)). But because by contrast factual determinations receive deferential review, courts may not "reweigh the evidence or substitute [their] own judgment for that of the ALJ" and will affirm Commissioner's decision if it is supported by substantial evidence (id.). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (Richardson v. Perales, 402

7

U.S. 389, 401 (1971) (internal quotation marks and citations omitted)).

As cases such as Haynes, 416 F.3d at 626 (internal quotation marks and citations omitted) teach:

> In rendering a decision, the ALJ must build a logical bridge from the evidence to his conclusion [but] need not . . . provide a complete written evaluation of every piece of testimony and evidence.

Hence "[i]f the Commissioner's decision lacks adequate discussion of the issues, it will be remanded" (Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009)). Reversal is also required if the ALJ has committed a legal error, regardless of how much evidence supports his or her determination (Binion on behalf of Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997)).

To qualify for benefits a claimant must be "disabled" within the meaning of the Act (Liskowitz v. Astrue, 559 F.3d 736, 739 (7th Cir. 2009), citing Section 423(a)(1)(E)). "Disability" is defined in Section 423(d)(1)(A) as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Claimants must also demonstrate that the disability arose during the period when they were insured (Section 423(a)(1)(A) and (c)(1)).

Social security regulations set forth a sequential five-step inquiry that must be conducted to determine whether a claimant

8

satisfies the "disability" definition (Liskowitz, 559 F.3d at 740, citing Reg. §§404.1520 and 416.920). Specifically the ALJ must determine (Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001), citing Reg. § 404.1520):

> (1) Whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disability impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy.

At step five of the analysis, the ALJ may use the Medical Vocational Guidelines to determine whether the claimant's exceptional limitations prevent him or her from performing any work (Fast v. Barnhart, 397 F.3d 468, 470 (7th Cir. 2005)). If however the claimant suffers from both exceptional and nonexertional impairments, the Medical Vocational Guidelines are not determinative, but rather "provide a framework for consideration" (id. at 471, quoting Reg. Pt. 404, Subpt. P., App. 2 §200.00(e)(2)).

**ALJ Opinion**

After reviewing the evidence and purportedly applying the five-step analysis outlined above, ALJ Anglada made these findings (R. 24-35):[4]

---

[4] What follows in the text are paraphrased findings (except where quotation marks are used), and only findings relevant to this opinion are included in the list.

9

1. Calhoun has three "severe impairments": (1) adjustment disorder with depressed mood, (2) substance abuse disorder and (3) "status post skin graft of the neck."

2. Calhoun "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments . . . ."

3. Calhoun has the residual functional capacity ("RFC")

   to:

   perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: claimant should not be exposed to moving or dangerous machinery; claimant cannot perform work tasks that require less than a moderate inability to maintain attention and concentration for extended periods; claimant cannot perform work tasks that require less than a moderate inability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; claimant cannot perform work tasks that require less than a moderate inability to accept instructions and respond appropriately to criticism from supervisors; claimant cannot perform work tasks that require less than a moderate inability to set realistic goals or make plans independently from others.

4. Calhoun is capable of performing past relevant work as a "bus service worker." "This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity."

5. Calhoun has not been under a disability from February 15, 2007 (the alleged onset date) through the date of decision.

Before this opinion turns to those findings, this Court needs to explain why it placed the word "purportedly" as a qualifier to the ALJ's treatment of the five-step analysis.

Evaluation of the ALJ Opinion

There is an overriding threshold flaw in ALJ Anglada's treatment of Calhoun's case that appears to have escaped the litigants' counsel -- perhaps excusable on their part (though the Court does not believe that to be so on the part of social security practitioners with even a modicum of experience), but totally unwarranted on the part of an ALJ whose very business it is to know better. Here is the boilerplate final paragraph (R.35) in the ALJ's 12 pages of Findings of Fact and Conclusions of Law, immediately preceding the two short paragraphs that announce the ultimate Decision rejecting Calhoun's disability claim:

> 7. The claimant has not been under a disability, as defined in the Social Security Act, from February 15, 2007 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Yet it is painfully apparent from the multipage detailed discussion that precedes that paragraph that the ALJ focused entirely on the asserted absence of a disability <u>as of the date of the Hearing</u>, based in substantial part on extremely recent evidence (recent as of the date of the Hearing) to support the conclusion that Calhoun was not disabled as of that date.

So fundamental an error on the part of a judicial officer who spends full time (or substantially full time) in adjudicating

11

social security disability claims is difficult to understand.[5] After all, the same task is involved whenever, as here, the claimant identifies a claimed disability onset date that antedates his or her filing of a claim. Indeed, the same is true even when no earlier onset date is claimed, for even there the ALJ's hearing necessarily postdates the claim date.

Although this is admittedly speculative, it has occurred to this Court that it may be the fact that the statement of the regulations' five-step inquiry is framed in the present tense (see the earlier quotation from the Dixon case) that threw the ALJ off the rails. But that simply reflects the truism that the disability inquiry must be made throughout the continuum that begins with the claimed onset date and ends with the hearing date, much as though the ALJ were evaluating a motion picture at every frame of that time period instead of the ALJ's evaluation of a snapshot taken on the date of the hearing.

It is a fundamental principle in social security jurisprudence that a claimant does not need to have a current disability to qualify for benefits (Jackson v. Astrue, No. 09 C 5028, 2010 WL 4793309, at *13 (N.D. Ill. Nov. 18)). Instead Calhoun is entitled to benefits if he was disabled for any

---

[5] This should not be misunderstood as a global criticism of the extensive work performed by the ALJ in answering the question he did address: the existence vel non of a qualifying disability on the Hearing date.

12

<u>consecutive</u> <u>12 month period</u> between his onset date and the date of the Hearing. For example, even if the skin graft surgery were found to be ultimately successful, Calhoun could still have been disabled up until that point, creating a "closed period" that would still entitle him to benefits (see, e.g., <u>Jackson</u>, 2010 WL 4793309, at *13-14; <u>Hurley v. Astrue</u>, 714 F. Supp.2d 888, 897-98 (N.D. Ill. 2010); <u>Brown v. Massanari</u>, 167 F.Supp.2d 1015, 1020-21 (N.D. Ill. 2001)). On the remand that must necessarily take place because of the ALJ's truly basic error, the ALJ conducting the remand hearing (more on that subject later) must specifically evaluate whether Calhoun was disabled for any consecutive 12 month period, even if the ALJ finds that Calhoun is not currently disabled.

**Listings Analysis**

With that indisputable principle in mind, this opinion now turns to the issues raised by the parties in their briefs. ALJ Anglada's error in centering his focus solely on Calhoun's disability as of the date of the Hearing pervades many other aspects of his opinion as well as invalidating his conclusion. Hence the discussion above informs each of the other issues discussed hereafter.

First Calhoun argues that ALJ Anglada did not explain sufficiently why Calhoun's impairments did not meet or equal the relevant listings. Calhoun contends that while the ALJ discussed

13

at length why Calhoun's mental impairments did not meet the listings, he omitted any discussion of why Calhoun's neck wound did not equal the listings.

As stated in Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006) (internal citations and quotation marks omitted):

> [The claimant] has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing. But this court has also held that an ALJ should mention the specific listings he is considering and his failure to do so, if combined with a perfunctory analysis, may require a remand.

ALJ Anglada's discussion of whether Calhoun's impairments met the listings spans 4-1/2 pages (R. 25-29), but almost four of those pages are devoted to a discussion of Calhoun's mental impairments. There is no discussion at all of Calhoun's neck wound, and no specific mention of what listing the wound could potentially meet or of the interaction between that wound and the other impairments that it clearly exacerbated. Here is the purely tangential reference to what might be regarded -- but only through an extraordinary stretch of the English language -- as the possible relevance of Calhoun's neck wound, in which the ALJ states that he (R. 25, emphasis added):

> independently consider[ed] the criteria of the pertinent physical listings (including the listings for the musculoskeletal, respiratory, cardiovascular, digestive, genitourinary, hemic and lymphatic, endocrine, neurological, immune systems and for visual impairments, hearing impairments, skin diseases, and cancer).

14

That cryptic reference to "skin diseases" in the middle of a list of 13 broad categories of potential physical ailments (many of which have nothing to do with Calhoun's alleged impairments) provides no insight into why ALJ Anglada did not discuss the neck wound in terms of meeting or not meeting a relevant listing, or indeed whether the ALJ even considered a relevant listing at all. Even at the endpoint in time to which the ALJ mistakenly limited his focus, it might well have been determined that the impairment limited Calhoun's ability to move his head and neck, which according to VE Knutson would preclude his employment as a bus servicer -- and remember that the existence of the neck wound, and of Calhoun's numerous other impairments that it caused, contributed to or impacted, was far more relevant throughout a substantial period of time from and after the claimed February 2007 onset date. On remand the ALJ assigned to the case must address specifically whether Calhoun's neck wound (independently or in combination with his other impairments) meets a listing either currently or during any consecutive 12-month period within the relevant time period.

**RFC Assessment**

Calhoun argues that the ALJ erred in relying too heavily on the opinion of state agency physician Dr. Richard Bilinsky. Whatever may be said on that score, it is clear that Dr. Bilinsky's opinion relates only to the time period after Calhoun

15

had his surgery and reflected his prediction that the wound would be nonsevere by January 2009 (a year after the surgery). Thus while Dr. Bilinsky's opinion may certainly be part of the mix for a portion of the decision as to disability, it bears at best on the period after his prediction proved accurate.

Calhoun next contends that ALJ Anglada erred by failing to consider certain favorable evidence when assessing Calhoun's RFC. Calhoun points out three areas of evidence that he says the ALJ should have taken into account: (1) evidence as to Calhoun's limited range of motion in his neck, (2) evidence about Calhoun's ability to perform full-time work and (3) an explanation of whether Calhoun would be off task more than 20% of the day. As to the first two points, while the AlJ Anglada's discussion may have been adequate as it related to Calhoun's disability status at the Hearing date, on remand the ALJ must carefully consider both of those factors as they relate to the entire relevant time span.

As to the third point, on remand the ALJ must specifically evaluate, for each portion of the relevant time span, whether Calhoun's RFC limitations translate into a finding that he would have been off-task for a certain percentage of the day. It should be remembered that when questioning VE Knutson at the Hearing, the ALJ imposed several "moderate inabilities" in the questions (R. 83-84). Calhoun's counsel then asked VE Knutson if

16

it would change the analysis to consider the cumulative effect of all of the assertedly "moderate inabilities," as opposed to considering the effect of each individual inability separately (R. 85-86). VE Knutson asked him to restate that in vocational terms, and Calhoun's attorney said that the "moderate inabilities" would mean that the hypothetical individual would be able to stay on task for only 80% of the day (R. 86).

VE Knutson then opined that an individual who was off task more than 10% to 15% of the day could not perform as a bus servicer (R. 86). When evaluating those issues in his RFC determination, ALJ Anglada found that Calhoun's RFC included "less than a moderate inability" to perform certain tasks such as those that require extended attention and concentration, but he said nothing about whether those limitations translated into an inability to stay on task for a certain amount of the day (R. 30).

On that score Calhoun argues, citing Olson v. Astrue, No. 08-C-0996, 2009 WL 2365511 (N.D. Ill. March 16),[6] that the ALJ should have discussed why he found that those "moderate

---

[6] Commissioner Mem. 8 argues that Olson is unreported and "[t]hus, it is not binding and, in this case, not even persuasive." Commissioner should remember that whether or not a district court case is reported has no impact on its ultimate authority or lack of authority. No district court decision is "binding" on another district court, and its "persuasiveness" -- the relevant consideration -- is determined by the substance of the case, not by its place in the Federal Supplement.

17

inabilities" did not mean that Calhoun would be off task 20% of the day and therefore unable to perform as a bus servicer. Olson dealt with a situation where the VE had stated that an individual who had certain moderate limitations and was off task for five to ten minutes per hour would be unable to perform the relevant work. Magistrate Judge Sidney Schenkier held that the ALJ should have discussed how the claimant's moderate limitations would translate into lost work time.

This Court finds that ruling highly persuasive, for as in Olson the same issue could be important for part of the relevant time period here. VE Knutson stated specifically that an individual who was off task 20% of the time could not perform work as a bus servicer. For whatever time period the bus server job may remain relevant on remand, the ALJ handling the case should speak to the portion of the workday that Calhoun would be off task.

**Calhoun's Obesity**

Next Calhoun argues that ALJ Anglada erred in his evaluation of Calhoun's obesity, as to which the ALJ found Calhoun's BMI was in the 38-40 range. With that BMI the ALJ found Calhoun was in the "middle range of obesity" and therefore limited to "the light exceptional level of work" (R. 33). Under SSR 02-01p a BMI of 35.0-39.9 constitutes "Level II" obesity, while a BMI over 40 constitutes "Level III" obesity or "extreme obesity."

18

According to his medical records, Calhoun's weight fluctuated fairly widely, with his lowest weight listed as 253 pounds (a BMI of 37.4) and his highest weight listed at 276 pounds (a BMI of 40.8) in February 2009 (R. 966). That range appears to be at odds with the ALJ's characterization of Calhoun as in the "middle range of obesity." On remand the ALJ's evaluation should look separately at the times when that was so and at the times when Calhoun's BMI temporarily crossed the threshold into "extreme" obesity.

Calhoun also points out that the ALJ did not discuss the effects of the obesity properly -- that is, both independently and in combination with Calhoun's other impairments. That should be corrected on remand, for the extent of Calhoun's obesity may be relevant throughout the entire relevant timespan.

**Calhoun's Fatigue**

Calhoun's final argument is that the ALJ erred by failing to consider Calhoun's fatigue in combination with his other impairments in determining the kind of work that he was capable of performing. Here too, on remand the ALJ should address the factor of Calhoun's fatigue as it relates to the entire relevant timespan.

## Conclusion

For the reasons stated at length in this opinion, both motions for summary judgment are denied and Calhoun's motion for

19

remand is granted for a fresh consideration of his disability throughout the relevant time period.  For that purpose this Court does not of course have the power to determine the choice of an ALJ to be assigned to the case on remand, but our Court of Appeals has not been diffident about urging that a new ALJ should handle the remand where circumstances appear to call for it (see, e.g., such cases as Golembiewski v. Barnhart, 322 F.3d 912, 918 (7th Cir. 2003) and, more recently, Collins v. Astrue, 824 F. App'x 516, 522 (7th Cir. 2009).

This Court will not speak that forcefully in this case, but it does suggest that Commissioner consider the possibility that ALJ Anglade's ruling on remand might be affected (even subliminally) by the criticism that has been voiced in this opinion.  If so, Commissioner may want to consider opting for a reassignment of the case (a consideration entirely within Commissioner's discretion).

_____
Milton I. Shadur
Senior United States District Judge

Dated: August 12, 2013

20